## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Otis Franklin Clark,<br><br><br>Debtor(s). | C/A No. 16-02104-HB<br><br>Adv. Pro. No. 16-80105-HB |
| Judy A Robbins, United States Trustee for Region Four,<br><br><br>Plaintiff(s),<br><br>v.<br><br>Otis Franklin Clark,<br><br><br>Defendant(s). | Chapter 7<br><br>**ORDER DENYING DISCHARGE PURSUANT TO 11 U.S.C. §§ 727** |

**THIS MATTER** came before the court for a trial on the Complaint filed by the United States Trustee ("UST"), seeking denial of Debtor Otis Franklin Clark's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A) and (B) and 727(a)(4)(A). Linda K. Barr represented the UST and V. Lee Ringler appeared on behalf of Clark. Julie Smoak with the office of the UST, Clark, and Jason Stallings testified. The parties presented stipulations and introduced numerous exhibits.

After considering the evidence and observing the credibility of the witnesses, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding pursuant to Fed. R. Bankr. P. 7052, and finds that Clark's discharge should be denied.

## I.   FINDINGS OF FACT[1]

Clark filed for voluntary Chapter 7 relief on April 27, 2016. Clark's original schedules and statements were filed on the same day ("April Schedules"). His meeting of creditors pursuant to 11 U.S.C. § 341 was held on May 27, 2016 ("May 341"). At the May 341, Clark testified that his April Schedules were correct and he reviewed them before signing. On July 7, 2016, Clark was again questioned under oath by Robert F. Anderson, Chapter 7 Trustee, and the UST during an examination pursuant to Fed. R. Bankr. 2004 ("July 2004").

In response to questioning by the UST and Chapter 7 Trustee at the May 341 and during the July 2004, Clark filed amended schedules on July 12, 2016 ("July Amendments").[2] On July 18, 2016, the UST filed its Complaint initiating this adversary proceeding. The UST asserts Clark failed to properly and timely disclose assets, which were discovered as a result of a search of public records and a review of bank statements, and made a false oath. Thereafter, Clark filed his second amended schedules and statements on August 15, 2016 ("August Amendments").[3] An analysis of the evolution of Clark's disclosures and non-disclosures follows.

### A.   PROBATE ESTATE

Clark's April Schedules made no mention of any interest or involvement in a probate estate. Clark's response to item 23 on the Statement of Financial Affairs ("SOFA") stated he does not hold or control any property that someone else owns. He also responded "No" to question 32 on Schedule B, which asks a debtor if he has "any interest in property that is due you from someone who has died." Clark later testified at the May 341 that he was not going

---

[1] Several facts are not in dispute and the Joint Statement filed by the parties prior to trial indicated no objection to the exhibits submitted by the UST. ECF No. 12, filed Dec. 19, 2016.

[2] This filing consisted of Amended Schedules A/B, C, I, and J.

[3] This filing consisted of Amended Schedules A/B and G and an Amended Statement of Financial Affairs.

to receive anything as a result of the death of his deceased wife.  Instead, he stated that his stepson, Jason Stallings, would receive everything.

According to Aiken County Probate Court records, Rita Danyelle Clark, a.k.a. Rita H. Stallings Clark, died on June 11, 2012.  At the time of her death, she and Clark were married. The probate records for the Estate of Rita H. Stallings Clark (the "Probate Estate") show that Jason Stallings renounced his role as personal representative of the Probate Estate on July 30, 2014.  At that time, the probate records indicate Clark was appointed personal representative and was re-appointed on March 18, 2016, a little more than one month before he filed his April Schedules.

When initially questioned regarding the Probate Estate at the May 341, Clark responded that Stallings was the personal representative.  After confronted with information in the probate records, Clark eventually admitted he was the personal representative of the Probate Estate.  Thereafter, Clark's July Amendments added to Schedule C a claimed exemption of $5,270.00 for Clark's interest in the Probate Estate, pursuant to S.C. Code Ann. § 15-41-30(A)(5).  Clark's August Amendments changed his response to item 23 on the SOFA to disclose his role as personal representative and his control of funds on deposit at Wells Fargo in an account for the Probate Estate in the amount of $2,229.00.  He failed to list in his schedules or amendments thereto any other property of the Probate Estate.

### B.  REAL PROPERTY

The Aiken County records reflect that a Proposal for Distribution in the Probate Estate dated March 5, 2016 ("Distribution") was filed a little more than a month before his bankruptcy case on the day Clark was re-appointment as personal representative (March 18, 2016).  The  Distribution states Stallings would receive from the Probate Estate two parcels

3

of real property identified as 187 Kathwood Lane, Jackson, South Carolina, and Old Jackson Highway, Jackson, South Carolina (collectively, the "Jackson Properties"), a 50% interest in a 2003 Ford Expedition, and all of the decedent's personal property.  The Distribution states the total value for the foregoing property is $20,884.00.  The Distribution also states Clark would receive from the Probate Estate real property bearing tax map number 027-03-05-006 in Beech Island, South Carolina (the "Forrest Drive Property") and the funds on deposit in a Wells Fargo savings account in the name of the decedent, collectively valued therein at $15,841.00.  The Distribution is signed by Clark.

The records for the Probate Estate include two deeds of distribution filed on March 21, 2016.  One conveyed the Jackson Properties from the Probate Estate to Clark (as opposed to Stallings, as reflected in the Distribution).[4]  The other conveyed the Forrest Drive Property from the Probate Estate to Stallings (as opposed to Clark, as reflected in the Distribution).[5]  The probate records reflect that these conveyances were made pursuant to a "private family agreement."[6]  The deeds of distribution were signed by Clark, as personal representative, on March 5, 2016.  Despite the foregoing, Schedule A/B of Clark's April Schedules do not disclose any legal or equitable interest in any real property, no equitable or future interest in property, and no interest in property that was due from someone who died.

At the May 341, Clark initially testified he did not own any real estate, had not owned any real property within the past six years, and had not transferred any property worth more than $5,000 in the past five years.  After confronted with the existence of the Probate Estate,

---

[4] This deed of distribution was recorded with the Aiken County Register of Mesne Conveyances on April 5, 2016, in Deed Book RB459 at Page 1502.
[5] This deed of distribution was recorded with the Aiken County Register of Mesne Conveyances on April 5, 2016, in Deed Book RB459 at Page 1505.
[6] The UST requested a copy of this agreement during the May 341; however, no written agreement was presented to the Court for review.

he testified that he would not inherit any property from the Probate Estate because it would all be distributed to Stallings.  Only during the May 341 when the UST presented him with the deeds of distribution bearing his signature and transferring realty to him did Clark acknowledge that the public record contradicts his testimony.  He further explained that the public record was in error because he was not to receive anything from the Probate Estate and all of the property was to go to Stallings.

Less than two weeks after the May 341, Clark signed two corrective deeds of distribution on June 7, 2016.  These corrective deeds conveyed the Jackson Properties to Stallings and the Forrest Drive Property to Clark to conform to the Distribution filed pre-petition.[7]  The corrective deeds were recorded on June 9, 2016.  Clark did not request permission from this Court for authority to transfer any property.

At the July 2004, the UST presented Clark with the corrective deeds found on the public record.  Clark acknowledged that he transferred real property from the Probate Estate to Stallings and himself pre-petition, and then executed the corrective deeds post-petition. When pressed, Clark admitted that he knew he was to receive property from the Probate Estate and he and Stallings reached an agreement, with the assistance of probate counsel, which was reflected in the Distribution.  Despite the fact that Clark's Schedule A/B was amended twice thereafter with the July Amendments and the August Amendments,  they were never amended to reflect that at the time of filing he held title to real estate and/or expected to receive this inheritance.

---

[7] The corrective deed of distribution conveying the Forrest Drive Property to Clark was recorded with the Aiken County Register of Mesne Conveyance on July 9, 2016, in Deed Book RB4608 at Page 1077.  The corrective deed of distribution conveying the Jackson Properties to Stallings was recorded with the Aiken County Register of Mesne Conveyance on July 9, 2016, in Deed Book RB4608 at Page 1081.

5

At trial, Clark acknowledged that he signed the deeds of distribution and the corrective deeds of distribution, but explained he believed he did not have to reveal the omitted information because the Probate Estate was not closed.  Stalling's trial testimony affirmed there was an agreement between he and Clark regarding the property to be distributed from the Probate Estate.  Stallings also testified that he believed he received all of the real and personal property from the Probate Estate.  However, the records for Aiken County show Clark is the registered owner of the Forrest Drive Property pursuant to the June 2016 corrective deed of distribution.

### C.  BANK ACCOUNTS AND FUNDS ON HAND

There is significant information indicating Clark had far more resources in cash and accounts than he disclosed.  In his April Schedules, Clark disclosed the following on Schedule A/B:

- $100.00 cash on hand;
- $350.00 in a checking account with Wells Fargo;
- $00.00 in a checking account with SRP Federal Credit Union ("SRP"); and
- $105.00 in a savings account with SRP.

Additionally, item 23 on Clark's SOFA reflected he did not hold or control any property that someone else owns, and item 20 on the SOFA reflected he did not make any transfers of financial accounts held in his name or for his benefit.

Prior to the May 341, SRP filed a Motion for Relief from Automatic Stay on May 4, 2016, requesting its claim against the estate be offset by the funds in Clark's accounts with SRP.  It is undisputed that Clark had a total of $1,118.82 in his accounts with SRP at the time he filed for bankruptcy protection – not the amounts set forth in his April Schedules.

At the May 341, Clark confirmed he had minimal funds on the date of filing as his April Schedules reflect. When presented with contrary information from his bank statements, Clark admitted he withdrew $3,540.00 from his Wells Fargo account on the petition date to pay attorney's fees and his bills over the following several weeks. Item 16 of Clark's SOFA indicates he paid his attorney only $460.00 on the date of filing. The testimony and bank statements presented at the January 11, 2017 trial established that Clark cashed a $3,540.00 check payable to himself on the petition date.

During the May 341, the UST noted multiple transfers that occurred between March 18, 2016, and March 21, 2016, among bank accounts in the names of "Rita D. Clark," "the Estate of Rita D. Clark (Otis F. Clark, as Personal Representative)," and "Otis F. Clark and Charlotte A. Luker." Specifically, when the UST asked if Rita Clark had a savings account at the time of her death, Clark disclosed she had approximately $2,229.00 in a savings account with Wells Fargo that he transferred to a Probate Estate account he established. The bank statements of accounts held by Rita Clark and the Estate of Rita Clark show that funds totaling $2,229.02 were withdrawn from the Rita Clark account and that same amount was deposited into an Estate account on March 18, 2016. The bank statements for the Estate of Rita Clark account also show that Clark transferred $2,000.00 from that account to his personal checking account three days later on March 21, 2016. When confronted with this information at the May 341, Clark confirmed that he had made these transfers and explained that the funds belonged to him because they originally came from his checking account.

After questioning by the UST and after this adversary case was filed, Clark filed his July Amendments and August Amendments changing his response to item 23 of the SOFA to reflect the $2,229.00 on deposit at Wells Fargo Bank in an account for the Estate of Rita Clark

to which he was personal representative.  However, the amendments failed to address the subsequent transfer to Clark's personal account.  No other relevant amendments were made.

### D. VEHICLES

In Clark's April Schedules, Schedule A/B listed the following seven (7) vehicles:

- 2016 Ford F-250;
- 2006 Lincoln Mark LT pickup;
- 2016 Ford Fusion;
- 2015 Ford Explorer;
- 1996 Lincoln Town Car;
- 2003 Yamaha Road Star; and
- 2003 5th Wheel Cedar Creek Travel Trailer

Clark's response to item 15 of the SOFA reflected he had no losses of property within one year before filing for bankruptcy and his response to item 18 reflected he did not transfer property any within the two years before filing for bankruptcy.

At Clark's May 341, when asked if he owned any other vehicles not listed on his schedules, Clark disclosed that he previously owned a 2012 Mustang.  In 2015 Clark traded-in that Mustang for a 2015 model.  Neither vehicle was mentioned in the April Schedules. Clark further disclosed that the 2015 Mustang was totaled after a wreck that occurred on or about October 6, 2015.  When questioned whether he received any insurance proceeds from the totaled 2015 Mustang, Clark initially responded that all of the insurance proceeds went directly to the lienholder.  At some point in time thereafter, Clark provided the UST with a copy of a letter from State Farm, dated October 28, 2015.  Contrary to Clark's May 341 testimony, the letter from the insurer evidenced that it paid $56,306.64 to the lienholder for the totaled 2015 Mustang and paid Clark $5,253.88 approximately seven months before his bankruptcy case was filed.

8

After disclosing ownership of the Mustangs, Clark assured the UST he had no other unlisted vehicles.  However, upon further questioning, Clark admitted he also owned a 2006 Yamaha motorcycle.  Clark's admission came only after the UST specifically questioned him about the existence of a second Yamaha motorcycle listed on the Aiken County property tax records.  Clark stated that even though he is the registered owner of the 2006 Yamaha, someone named Billy Graham was in possession of it.

Clark eventually disclosed these property interests and transfers in his August Amendments.  Clark's response to item 18 of the SOFA was amended to disclose his prior ownership of the 2012 Mustang and receipt of $10,000 for the trade-in of this vehicle, his prior ownership of the 2015 Mustang, and his receipt of $5,253.88 from the insurance proceeds after the lien was paid.  Additionally, his Schedule A/B was amended to include the 2006 Yamaha motorcycle.

### E.  EXECUTORY CONTRACTS/LEASES AND EXPENSES

Clark's April Schedules failed to list executory contracts and to accurately reflect his expenses.  He reported on his Schedule J that he paid no rent or mortgage payment for any purpose.  Clark also answered "No" on Schedule G when asked "do you have any executory contracts or unexpired leases?"  When the UST asked Clark whether he had any such payments at his May 341, Clark revealed that he lives on a rental lot and pays $145.00 per month.  The UST also questioned Clark about a recurring payment to River Country Rent on his bank statements.  In response, Clark disclosed that he also had a rent-to-own agreement for the small storage building located at his residence.  Clark explained that he did not believe this storage rental agreement needed to be disclosed in his bankruptcy schedules and statements because he did not yet own the storage building.  Thereafter, in Clark's July

Amendments, Schedule J was amended to add the $150.00 monthly rental payment and in his August Amendments, Schedule G was amended to disclose the "RTO contract for 12/24 outbuilding; $133.63 monthly; title passes upon final payment."

### F. UNDISCLOSED SPOUSE AND INCOME

Clark's testimony and sworn statements regarding whether he was married at the time of filing are irreconcilable, and these inconsistencies denigrate his credibility and candor toward this Court.  The trial record includes Clark's federal income tax returns for 2014 and 2015.  In both returns, Clark marked the box indicating that he was "Married filing jointly" with Charlotte Luker.  In each tax return, Clark claimed exemptions for himself and marked the box designated for an exemption for his "Spouse."  Clark's 2015 tax returns were submitted for filing to the Internal Revenue Service by a tax preparer on Clark and Luker's behalf on March 15, 2016.

In his April Schedules, Clark was required to answer the very simple question of "What is your current marital status?"  That item 1 on the SOFA presents only two boxes that can be checked: "Married" or "Not Married."  A little more than one month after filing his joint tax return, Clark selected "Not Married" on his April Schedules.  When completing his Schedule I, Clark indicated "N/A" in the space where he would disclose any income from a non-filing spouse.  Item 11 of Schedule I also asks a debtor to "State all other regular contributions to the expenses that you list[ed] in Schedule J.  Include contributions from an unmarried partner, members of your household, your dependents, your roommates, and other friends or relatives."  Next to this item, Clark listed no contribution.

At the May 341, Clark testified under oath that his April Schedules were correct, affirming that he was not married, and that his wife, Rita Clark, was deceased.  After obvious

questions arose about the inconsistency between the representations to this Court and the IRS, Clark explained Luker lives in his household and is his "common law wife." He later disclosed at his April 2004 that Luker receives $600.00 per month in disability income. In Clark's July Amendments, he amended Schedule I to include Luker's income. Clark's SOFA was never amended to reflect that he is married.

At trial, the UST questioned Clark about the nature of his relationship with Luker, noting that they lived together, had a shared bank account, and filed their 2014 and 2015 tax returns jointly. When specifically asked why he failed to disclose Luker's existence in his April Schedules, Clark stated that he did not believe they were legally married and did not believe their relationship needed to be disclosed to this Court.

## II.    DISCUSSION AND CONCLUSIONS OF LAW

### A.    JURISDICTION

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(a) and (b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(J) and the parties have consented to this Court entering a final order.

### B.    BURDEN OF PROOF

"The Bankruptcy Code favors discharge of an honest debtor's debts and the provisions denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor." *In re Weldon,* 184 B.R. 710, 712 (Bankr. D.S.C. 1995). "In a proceeding to deny a debtor's discharge in bankruptcy, Bankruptcy Rule 4005 places the burden on the plaintiff to prove the objection by a preponderance of the evidence." *In re Voccia*, 477 B.R. 625, 632 (Bankr. E.D. Va. 2011) (citing *Farouki v. Emirates Bank Int'l, Ltd,* 14 F.3d 244, 249 (4th Cir. 1994)); *see also* Fed. R. Bankr. P. 4005 ("At the trial on a complaint

objecting to a discharge, the plaintiff has the burden of proving the objection.").  "Once a plaintiff establishes a prima facie case, the burden shifts to the debtor to offer credible evidence to satisfactorily explain his conduct; however, the ultimate burden remains on the plaintiff objecting to discharge." *In re Hooper*, 274 B.R. 210, 214-15 (Bankr. D.S.C. 2001) (citing *Farouki*, 14 F.3d at 249).

### C.  11 U.S.C. § 727(A)(4)(A)

The discharge of debts under the Bankruptcy Code requires debtors to be truthful and candid in providing all information necessary to determine the assets of the bankruptcy estate. *In re Crawford*, 553 B.R. 43, 48-49 (Bankr. W.D.N.C. 2016).  This principle is codified in § 727(a)(4)(A), which provides that a debtor shall be granted a discharge "unless the debtor knowing and fraudulently, in or in connection with the case, made a false oath or account." The elements of § 727(a)(4)(A) are: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement materially related to the bankruptcy case. *In re Poffenberger*, 471 B.R. 807, 819 (Bankr. D. Md. 2012) (citing *Sheehan v. Stout (In re Stout)*, 348 B.R. 61, 64 (Bankr. N.D. W.Va. 2006)); *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000). This Code section holds debtors accountable for providing complete and honest information and denies a discharge for those debtors who are not truthful and forthcoming in their schedules and statements. *Crawford*, 553 B.R. at 49.

After considering the whole of the record and the testimony, and having an opportunity to observe the credibility of the witnesses, the Court finds the UST has proven by a preponderance of the evidence that Clark knowingly made false statements under oath regarding material information related to his bankruptcy estate with the requisite intent and

without sufficient explanation.  Accordingly, a denial of Clark's discharge is appropriate pursuant to § 727(a)(4)(A).  Each element of this cause of action is discussed below.

### 1.  CLARK KNOWINGLY MADE A FALSE STATEMENT UNDER OATH

A debtor has knowledge that his oath is false where the evidence provides that he omitted information or provided information contrary to what he knew to be true. *In re Hamo*, 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999) (quoting *Hunter v. Sowers (In re Sowers)*, 229 B.R. 151, 158 (Bankr. N.D. Ohio 1998)).  A statement does not have to be given orally while under oath for purposes of § 727(a)(4)(A).  A false statement on a debtor's schedules or statement of financial affairs qualifies as a false oath. *Voccia*, 477 B.R. at 632 (citations omitted). Although debtors are encouraged to file amended schedules and statements when new or erroneous information is discovered during the administration of their bankruptcy cases, filing amended schedules and statements only after confronted with evidence of one's errors and omissions does not nullify the effect of providing a false oath. *See McClenny v. C.H. & R. Enterprises, Inc.*, 205 F.3d 1334, 1334 (4th Cir. 2000) (finding that the district court was correct in determining "[the debtors'] amendment of schedules after their fraud is discovered during the meeting of creditors does not negate the fraud.") (citations omitted)*; see also In re Smith*, 161 B.R. 989, 992-93 (Bankr. E.D. Ark. 1993) (denying discharge of debts where debtors made amendments to their schedules only after their false statements and omissions were discovered by the trustee).

The April Schedules, July Amendments, and August Amendments were signed and filed under oath.  Clark's testimony at the May 341, July 2004, and trial were also under oath. The evidence, detailed above, overwhelming indicates that he made false oaths and accounts involving interests in personal and real property, his role as personal representative of his

deceased wife's estate, his marital status, his household income and expenses, and pre- and post-petition transfers of real property and funds.  The evidence also demonstrated that Clark knew of the existence of the omitted property and interests prior to and close to the time of his misrepresentations and lack of disclosure, and failed to accurately report required information until confronted with documentary evidence to the contrary by the UST.  Clark failed to answer even the simplest questions truthfully and consistently.  The record clearly supports a finding that the UST has met its burden of showing that Clark made several statements under oath, the statements were false, and Clark knew the statements were false at the time that they were made.

## 2.  CLARK ACTED WITH FRAUDULENT INTENT

A debtor is not likely to admit taking action with fraudulent intent; therefore, fraudulent intent must be determined by reviewing circumstantial evidence and drawing inferences from the debtor's course of conduct. *Poffenberger*, 471 B.R. at 819 (citing *Hatton v. Spencer (In re Hatton)*, 204 B.R. 477, 483 (E.D. Va. 1997)).  A "pattern of concealment and nondisclosure" is sufficient for a court to "draw an inference of the requisite intent." *Id.* (citing *In re Ingle*, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987)).  Additionally, "the functional equivalence of fraudulent intent" is present where a debtor shows "reckless indifference of the truth." *Id.* (citing *In re Johnson*, 139 B.R. 163, 166 (Bankr. E.D. Va. 1992)).  Numerous false statements on a debtor's schedules and statements rise to this level of reckless indifference. *See In re Colburn*, 145 B.R. 851, 858 (Bankr. E.D. Va. 1992) (finding a reckless disregard for the truth existed where a debtor made seven inaccurate statements under oath and with the assistance of counsel); *see also In re Berger*, 497 B.R. 47, 56 (Bankr. D.N.D. 2013) ("Courts are often understanding of a single omission or error resulting from an

innocent mistake, but multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth.")

Clark's numerous false statements rise above the level of reckless indifference to the truth.  For example, shortly after filing documents with the IRS claiming the benefits of a spouse, he submitted documents signed under penalty of perjury to obtain the benefits of bankruptcy that disavowed her existence and her impact on his required disclosures.  Likewise, while Clark was signing documents to the benefit of himself and his family in the probate court, he was submitting documents here and giving testimony that hid those benefits.  Only when confronted with irrefutable evidence did Clark disclose the existence of assets, interests, and transfers omitted from his April Schedules.   Incredibly, Clark's August Amendments still fail to fully disclose and accurately represent all of his property, interests, and pre-petition activity.  The continuity of omissions and false statements throughout Clark's bankruptcy case shows a "pattern of concealment and nondisclosure" sufficient for a finding of fraudulent intent.

### 3.   CLARK'S FALSE STATEMENTS WERE MATERIAL

The information Clark omitted or falsely provided must be material to meet the final element of § 727(a)(4)(A). *See In re Murray,* 249 B.R. 223, 228 (Bankr. E.D.N.Y. 2000) ("[T]he requirement [that false statements be material] was created by courts to ensure that debtors are not denied discharge for inconsequential or technical omissions." (citations omitted)).  A statement is material to a bankruptcy case if "it concerns the existence or disposition of a debtor's property." *Robinson v. Worley,* 540 B.R. 568, 573 (Bankr. M.D.N.C. 2015) (citing *Williamson v. Fireman's Funds Ins. Co.,* 828 F.2d 249, 252 (4th Cir. 1987)).  "An omission is material under 11 U.S.C. § 727(a)(4)(A) 'if it bears a relationship to the

bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *Crawford*, 553 B.R. at 49 (quoting *Williamson*, 828 F.2d at 252). A complete and accurate picture of the debtor's estate is essential to a bankruptcy case; therefore, even property the debtor believes is worthless must still be disclosed. *In re Gannon*, 173 B.R. 313, 320-21 (Bankr. S.D.N.Y. 1994).

Clark contends his omissions and misinformation concerned assets and matters of such minor value that they do not warrant a penalty as extreme as denial of his discharge. Even if the Court were to accept that it is a debtor's option to choose what assets are valuable enough to disclose and what questions in the required bankruptcy filings may be disregarded – which it does not – the matters here are indisputably material. For example, Clark and his probate counsel gave a valuation of $15,841.00 for his omitted inheritance from the Probate Estate alone. Courts have found assets valued far lower to be too significant for a debtor to omit without consequences. *See McClenny v. C.H. & R. Enters., Inc.*, 205 F.3d 1334 (4th Cir. 2000) (finding that $6,549.00 is sufficient value to form the basis for denial of discharge); *In re Kilson*, 83 B.R. 198, 203 (Bankr. D. Conn 1988) ("The sum of $4,000.00 is neither minor nor inconsequential."). Clark's assertion that the values of the omitted assets and information are too minor to deny his discharge are, therefore, unfounded and unpersuasive.

### D.  11 U.S.C § 727(a)(2)(A) and (B)

Clark's discharge must also be denied pursuant to § 727(a)(2), which provides the Court shall grant a debtor a discharge, unless:

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
> > (A)  property of the debtor, within one year before the date of the filing of the petition; or

(B)   property of the estate after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).

"Concealment is not confined to physical secretion.  It covers other conduct, such as placing assets beyond the reach of creditors or withholding knowledge of the assets by failure or refusals to divulge owed information." 6 *Collier on Bankruptcy* ¶ 727.02[6][b] (16th ed. rev.).  Concealment for the purposes of § 727(a)(2) includes any acts or omissions that hinder discovery of a debtor's property or assets of the bankruptcy estate such as "withholding knowledge or information required by law to be made known." *In re Butler*, 377 B.R. 895, 918 (Bankr. D. Utah 2006) (quoting *In re Scott,* 172 F.3d 959, 967 (7th Cir. 1999)).

The evidence convinces the Court that Clark knew at the time of filing that he held an interest in the Probate Estate and a current or future interest in real property and bank accounts of the Probate Estate, and he concealed those assets from this Court with the intent to hinder, delay and defraud creditors.  Even after discussion of his interests at the May 341, Clark signed documents transferring prior Probate Estate property that was then deeded in his name for the benefit of his family members and failed to properly disclose his interest in real property. From the whole of the evidence, the Court concludes Clark intended to conceal and shelter the Probate Estate and any assets related to it from creditors and officers of this bankruptcy estate.  The other concealments and non-disclosures detailed herein further support a finding of Clark's intentions.

## III.   CONCLUSION

Clark knowingly gave false oaths of material information with the requisite intent, and concealed property with the intent to hinder, delay, or defraud.  Clark failed to offer credible evidence to satisfactorily explain his conduct to rebut the UST's objections to his discharge.

Accordingly, the UST has met its burden under §§ 727(a)(2)(A) and (B) and 727(a)(4)(A) for

a denial of the discharge in this bankruptcy case.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**02/13/2017**



US Bankruptcy Judge
District of South Carolina

Entered: 02/14/2017